IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 24, 2018 Session

## STATE OF TENNESSEE v. JOSHUA COOL

**Appeal from the Criminal Court for Knox County**
**No. 102171C     G. Scott Green, Judge**

### No. E2017-00877-CCA-R3-CD

The Defendant, Joshua Cool, was convicted by a Knox County Criminal Court jury of two counts of first degree premeditated murder, first degree felony murder, two counts of second degree murder, and criminally negligent homicide. *See* T.C.A. §§ 39-13-202 (2014) (first degree murder); 39-13-210 (2014) (second degree murder); 39-13-212 (2014) (criminally negligent homicide). After the appropriate merger, the trial court sentenced the Defendant to concurrent sentences of life imprisonment for two first degree premeditated murder convictions and to two years' confinement for criminally negligent homicide. On appeal, the Defendant contends that (1) the evidence is insufficient to support his first degree murder convictions, (2) the trial court erred by denying his motion to suppress evidence recovered during a warrantless search and his subsequent police statement, and (3) the trial court erred by admitting various evidentiary items. We affirm the Defendant's convictions, but we remand the case to the trial court for the entry of a corrected second degree murder judgment to reflect the offense as a Class A felony.

**Tenn. R. App. P. 3 Appeal as of Right; Convictions Affirmed; Remanded for the Entry of a Corrected Judgment**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Forrest L. Wallace, Knoxville, Tennessee, for the appellant, Joshua Cool.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from an April 2013 incident in which Collin Colbert, Grace Standridge, and Ryan Gorny[1] sustained fatal blunt force trauma and strangulation. The Defendant and two codefendants, Brandon Roberts and Hope Warvi, were indicted for the first degree premediated and felony murder of Mr. Colbert, the first degree premediated murder of Ms. Standridge, two counts of the first degree felony murder of Ms. Standridge, and the first degree felony murder of Mr. Gorny. The record reflects that codefendant Warvi pleaded guilty to two counts of second degree murder and to facilitation of first degree murder in exchange for a thirty-year sentence at 100% service. Pursuant to the plea agreement, she agreed to testify truthfully at the Defendant's trial. Codefendant Roberts pleaded guilty to two counts of first degree murder and to second degree murder and received an effective life sentence. Lacy Colson was later charged with being an accessory after the fact but was ultimately found incompetent to stand trial and to testify.

At the trial, the parties stipulated to the authenticity of the recording of an April 9, 2013, 9-1-1 call, which led the police to the crime scene, and the recording was played for the jury. In the recording, the anonymous male caller stated a homeless man, staying at a camp near the location of "the old PSC metals" building, had bragged to the caller about having an outstanding felony arrest warrant in another state. The caller described the man as tall, "heavy-set," bald, wearing jeans and no shirt, and having numerous Nazi tattoos. The caller said the man was with two women, one of whom had pink hair and the other one who wore eyeglasses. The caller said the man's first name was Brandon, but the caller did not know the last name.

Knoxville Police Officer David Gerlach testified that on April 9, 2013, he responded to the 9-1-1 call, which led him to a "homeless campsite." Officer Gerlach stated that he received a report of a man with Nazi tattoos bragging about having outstanding felony arrest warrants. Officer Gerlach said that he and additional officers went to "PCS Metals" to find the man, that he saw a large tent on the property, and that he saw several people inside the tent when he opened it. He said that codefendant Roberts was inside the tent, along with other people matching the descriptions provided by the 9-1-1 caller. Officer Gerlach said that the people inside the tent came out of the tent and sat around a campfire but that he saw "a silhouette" of someone under blankets inside the tent. Officer Gerlach said that he entered the tent, nudged the person with his foot, and moved the blankets when the person did not move. Officer Gerlach said that he saw Collin Colbert, who had been deceased for some time, under the blankets and that blood was under Mr. Colbert's head. Officer Gerlach said that everyone inside the tent was questioned at the police department. Officer Gerlach

---

[1] Although the trial transcript and the indictment each reflect a different spelling of the victim's last name, the name is spelled "Gorny" in photograph exhibits of the victim's identification. We use Gorny for consistency.

identified photographs of the crime scene, including photographs of the Defendant, codefendant Hope Warvi, who wore eyeglasses, codefendant Brandon Roberts, Lacy Colson, who had pink hair, and Mr. Colbert.

On cross-examination, Officer Gerlach testified that the Defendant was barefoot when the photographs were taken at the scene. Officer Gerlach identified black shoes in a photograph and said the shoes were near the campfire area. Officer Gerlach identified a creek in the photographs and said he saw tents on both sides of the creek.

Officer Gerlach testified that he did not hear any noises coming from the tent before he opened it, although he verbally identified himself before he entered. He said that the tent was large, could have held eight people uncomfortably, and was tall enough to stand "hunched over."

Codefendant Hope Warvi testified that she was age twenty-five and had two children. She said that in November 2012, she was asked to leave her apartment and that because she did not have anywhere to go, she and her two children went to the family unit of a shelter at a mission. She said her children began living with their father soon afterward. She said that in January 2013, she met the Defendant at the mission and that later they became friends and began a romantic relationship. She recalled that the Defendant was from New York and had a daughter. Codefendant Warvi said that in March 2013, she and the Defendant met codefendant Roberts at the mission. She said that codefendant Roberts was from West Virginia and that he mentioned having outstanding arrest warrants. She said that she and Ms. Colson were friends before codefendant Warvi began dating the Defendant. Codefendant Warvi said that Ms. Colson and codefendant Roberts had a short romantic relationship.

Codefendant Warvi testified that in March or April 2013, Ms. Colson introduced Ryan Gorny to their group of friends. Codefendant Warvi recalled that Mr. Gorny was from Chicago and had Aryan Nation tattoos. She said that she initially liked Mr. Gorny but that she disliked his racial beliefs. She said that the Defendant began to dislike Mr. Gorny because the Defendant felt as though Mr. Gorny had "taken over" as the leader of their group. She said that the Defendant did not have an issue with Mr. Gorny's racism. She said that Mr. Gorny introduced Mr. Colbert to their group and that Mr. Colbert was not a white supremacist.

Codefendant Warvi testified that the tent in which the police found her, her friends, and Mr. Colbert had been abandoned. She said that her friends, Joe Holmes and Grace Standridge, stayed in a nearby tent and that she had known them longer than she had known the Defendant. Codefendant Warvi recalled that her friends, Larry Estler and "Brandy," socialized with her and the group in March and April 2013. Codefendant Warvi said that

beginning on April 1, she, the Defendant, codefendant Roberts, Ms. Colson, Mr. Estler, and Brandy stayed at a couple of motels, and that Ms. Colson's "check" paid the rent. Codefendant Warvi said that she took medication for depression and anxiety during this time.

Codefendant Warvi testified that around April 2, everyone returned to the campsite. She said that around April 8, Ms. Colson and "Dale," a friend, took codefendant Warvi to the emergency room, where she was treated for stomach pain and prescribed medication. Codefendant Warvi said that after her release, she returned to the campsite and that the Defendant, codefendant Roberts, Mr. Colbert, Ms. Colson, Mr. Gorny, Ms. Standridge, and Mr. Holmes were there drinking alcohol. She recalled that Ms. Standridge and Mr. Holmes argued because Ms. Standridge wanted to end their romantic relationship. Codefendant Warvi said that Mr. Holmes left the campfire and entered his tent, that she entered Mr. Holmes's tent to comfort him, that the Defendant told her to return to their tent and campfire, and that she complied. Codefendant Warvi said that Mr. Holmes returned to convince Ms. Standridge to leave with him, that Ms. Standridge refused to leave, that Mr. Holmes set his tent on fire, that Mr. Holmes "ran off" afterward, and that codefendant Warvi and the Defendant extinguished the fire.

Codefendant Warvi testified that after the fire had been extinguished, Ms. Colson and Mr. Gorny argued about a shirt Ms. Colson refused to return to Mr. Gorny, that Mr. Gorny spit in Ms. Colson's face, that Mr. Gorny tripped on codefendant's Warvi's foot, and that codefendant Warvi saw the Defendant and codefendant Roberts talk privately. She said the Defendant told her later that he told codefendant Roberts that Mr. Gorny had stepped on her foot and pushed her. She said that after the Defendant and codefendant Roberts talked, the Defendant and codefendant Roberts began pushing Mr. Gorny between them. She said that codefendant Roberts picked up a nearby "two-by-four" wooden board and struck Mr. Gorny on the head with it. She said that Mr. Gorny fell on the ground, that codefendant Roberts began hitting Mr. Gorny's face, and that Mr. Gorny "barely . . . put[] his hands up to defend himself." She said that codefendant Roberts then choked Mr. Gorny for several minutes and that Mr. Gorny stopped moving. She said that codefendant Roberts told her to place her hand over Mr. Gorny's mouth and that she complied.

Codefendant Warvi testified that nobody in the group attempted to intervene when the Defendant and codefendant Roberts began pushing Mr. Gorny. She recalled Ms. Standridge commented that Ms. Standridge was "used to stuff like this." Codefendant Warvi said that the Defendant had disappeared by the time she placed her hand on Mr. Gorny's mouth. She said that after Mr. Gorny stopped moving, she saw the Defendant and codefendant Roberts talking again, that codefendant Roberts called for her to come to them, and that the Defendant said, "We're going to have to kill them." She did not know to whom the Defendant referred when he said "them," but she thought the Defendant meant they needed to kill everyone because they knew what had occurred.

-4-

Codefendant Warvi testified that after Mr. Gorny stopped moving, Mr. Colbert repeatedly said, "I think he's dead." She said she told Mr. Colbert that Mr. Gorny was only "knocked out" and would awake soon. She said that Mr. Colbert checked on Mr. Gorny multiple times and repeated that Mr. Gorny was dead. Codefendant Warvi said that Ms. Standridge and Ms. Colson sat without speaking.

Codefendant Warvi testified that Mr. Gorny remained on the ground until later that night, when someone covered him with a blanket. She said that codefendant Roberts spoke to Ms. Colson, telling her to have sexual intercourse with Mr. Colbert. Codefendant Warvi said that codefendant Roberts wanted Mr. Colbert to fall asleep because codefendant Roberts intended to kill Mr. Colbert. Codefendant Warvi said that Ms. Standridge, codefendant Roberts, and the Defendant went into a tent belonging to "Karen" and Drew Underhill, who were not present that night. Codefendant Warvi thought codefendant Roberts intended to have sexual intercourse with Ms. Standridge. Codefendant Warvi said that she entered the large tent to sleep. She said that after she lay in the tent for ten to fifteen minutes, Mr. Colbert and Ms. Colson entered the tent and began having sexual intercourse. Codefendant Warvi said she pretended to sleep to avoid any embarrassment.

Codefendant Warvi testified that after Mr. Colbert and Ms. Colson finished having sexual relations, codefendant Warvi heard Ms. Colson outside the tent rattling codefendant Warvi's prescription bottle. Codefendant Warvi said she confronted Ms. Colson, who stated that she was attempting to put Mr. Colbert "to sleep scientifically." Codefendant Warvi took the medication from Ms. Colson and walked to Karen and Mr. Underhill's tent to find the Defendant. Codefendant Warvi said that inside the tent, she saw codefendant Roberts and Ms. Standridge lying naked and the Defendant "sitting in the corner leaned back on his heels kind of hunched over." Codefendant Warvi said that the Defendant told her to return to the other tent but that she joined Ms. Colson by the campfire instead. Codefendant Warvi said that a few minutes later, the Defendant and codefendant Roberts walked to the campfire and told her to enter the tent in which Mr. Colbert was asleep. Codefendant Warvi said that codefendant Roberts told her and the Defendant to hold Mr. Colbert while codefendant Roberts hit and strangled Mr. Colbert. She said that codefendant Roberts and the Defendant each hit and strangled Mr. Colbert and that eventually, Mr. Colbert stopped moving. She recalled Mr. Colbert's begging for them to "stop" and said that after he stopped moving, codefendant Roberts told her to place her hands around Mr. Colbert's neck. She said that she complied and that she held Mr. Colbert's neck for about thirty seconds. She said that Mr. Colbert urinated when he died and that some of the urine was on her clothes. She said that Ms. Colson did not enter the tent during the incident and did not ask what had occurred.

Codefendant Warvi testified that after Mr. Colbert died, codefendant Roberts and the Defendant told her to burn Ms. Standridge's clothes and wallet. Codefendant Warvi said that

the Defendant and codefendant Roberts returned to Karen and Mr. Underhill's tent while she burned Ms. Standridge's belongings. Codefendant Warvi said that Ms. Colson became tired and wanted to lie in the large tent but was scared to go inside alone. Codefendant Warvi said that she and Ms. Colson entered the tent together. Codefendant Warvi said that later, the Defendant told her and Ms. Colson to assist codefendant Roberts. Codefendant Warvi said that they followed the Defendant, that she saw what appeared to be a person wrapped in blankets, and that codefendant Roberts said Ms. Standridge was wrapped in the blankets. Codefendant Warvi said that she, Ms. Colson, the Defendant, and codefendant Roberts carried Ms. Standridge to an abandoned "metals building . . . across from the field." Codefendant Warvi said that Ms. Standridge was placed under the building, that the Defendant and codefendant Roberts began throwing rocks on Ms. Standridge to cover her but realized it would take too long, and that they covered Ms. Standridge with a grey blanket to conceal her.

Codefendant Warvi testified that after they disposed of Ms. Standridge, they returned to the campsite and that the Defendant and codefendant Roberts repositioned and covered Mr. Colbert with a blanket. She said that codefendant Roberts and the Defendant "took debris, like a wooden pallet" and a tarp to cover Mr. Gorny. She recalled that the sun began to rise and that initially, the plan was to move Mr. Colbert and Mr. Gorny to the same area as Ms. Standridge after dusk. She said that the four of them discussed going to Florida or South Carolina.

Codefendant Warvi testified that the Defendant and codefendant Roberts were calm and did not express remorse for the killings. She recalled Ms. Colson was initially upset but calmed quickly. Codefendant Warvi said that she, the Defendant, codefendant Roberts, and Ms. Colson slept in the tent with Mr. Colbert until 11:00 a.m. or noon. Codefendant Warvi said that the Defendant and codefendant Roberts went to a store to purchase beer with money the Defendant had taken from Mr. Colbert's wallet after the killing, that she and Ms. Colson stayed at the campsite, and that a man, who camped "on the back end of our tent," asked to borrow something. Codefendant Warvi said that after codefendant Roberts and the Defendant returned with beer, Dale arrived and asked if anyone knew Ms. Standridge's whereabouts because Ms. Standridge had a court date that morning. Codefendant Warvi said that "we" told Dale that Ms. Standridge and Mr. Holmes argued the previous night, that Mr. Holmes burned their tent and left angry, and that Ms. Standridge left a few minutes later to look for Mr. Holmes.

Codefendant Warvi testified that she, Ms. Colson, and Dale left the campsite and walked to the mission and that when she and Ms. Colson returned, the Defendant and codefendant Roberts were talking and laughing. Codefendant Warvi said that around 4:00 or 5:00 p.m., two men came to the campsite, cooked hotdogs, and left a couple of hours later. She said that she fell asleep outside when the men were there, that codefendant Roberts woke

her and told her to sleep inside the tent until dark, and that everyone slept inside the tent until the police arrived.

Codefendant Warvi testified that although she did not talk to the police about what occurred at the campsite, she spoke to two jail inmates, "Kim" and "Ashley," about most of the events. Codefendant Warvi knew that one of the inmates wrote a letter containing information codefendant Warvi had provided to the inmate and that the letter was intercepted by the police.

On cross-examination, codefendant Warvi testified that she took medication for depression, mood swings, anxiety, and bipolar disorder. She said that she had taken her medications regularly since her arrest but that she did not always remember to take them at the time of the killings. She recalled that codefendant Roberts hit Mr. Gorny with fists and that she was about two to four feet from where codefendant Roberts attacked Mr. Gorny. She said that she placed her hand over Mr. Gorny's mouth and nose for about one minute because codefendant Roberts wanted her to ensure Mr. Gorny was no longer breathing. She denied killing Mr. Gorny and said Mr. Gorny was not breathing when she placed her hand on his face. She agreed codefendant Roberts told her that he was proud of her and that she was "earning [her] stripes." She denied telling Ms. Colson that she would "do it again."

Codefendant Warvi testified that she did not attack Mr. Colbert when he and Ms. Colson were having sexual relations inside the tent. She identified a photograph of Mr. Colbert's hand and said the hand had blood, dirt, and hair on it. She did not recall Mr. Colbert's grabbing her hair during the killing and did not know if the hair in the photograph belonged to her. She also did not recall Mr. Colbert's hitting her in the head during the struggle but conceded photographs of her taken at the scene showed redness around her right eye. She agreed she squeezed Mr. Colbert's throat and said she removed her hands because Mr. Colbert was dead. She did not believe, though, that Mr. Colbert was alive when she placed her hands around his neck.

Codefendant Warvi testified that she last saw Ms. Standridge when codefendant Warvi opened Karen and Mr. Underhill's tent and found codefendant Roberts and Ms. Standridge lying naked inside and the Defendant crouched in the corner covering his private area with his hands. She agreed that on July 31, 2013, she wrote the Defendant a "hostile" letter because she was angry at him for giving her a sexually transmitted disease. The letter was received as an exhibit and was read to the jury. She admitted she was angry at the Defendant and said, "[I]f it wasn't for him initiating all these murders then I wouldn't be sitting here right now."

On redirect examination, codefendant Warvi testified that she wrote the July 31 letter after several months of confinement and stated in the letter that the truth would emerge. She

agreed she did not state in the letter that she would lie about the killings. She denied threatening the Defendant. She stated that she understood the legal concept of criminal responsibility and that although she did not kill any of the victims, she had taken responsibility for the killings.

Micah Hunley testified that he was in police custody for a probation violation at the time of the trial, that he had been convicted of robbery, and that the probation violation was related to his failure to report to his probation officer. He said that on June 26, 2015, he and the Defendant waited in the courthouse for their respective court hearings and that they spoke about various things, including their charges. Mr. Hunley said that the Defendant's main concern was whether the trial court would reduce the Defendant's bond and that the Defendant wanted to be released because the Defendant wanted to "run" from Tennessee. Mr. Hunley said that the Defendant knew the State had extensive evidence against the Defendant and wanted to leave Tennessee "before anything popped on him." Mr. Hunley said that the Defendant admitted being charged with murder and thought his only choice was to flee. Mr. Hunley said that the Defendant did not provide details of the offenses but admitted "he did two people."

Mr. Hunley testified that he told his attorney about his and the Defendant's conversation, that his attorney contacted the prosecutor, and that he hoped the State would not oppose his return to probation at the revocation hearing. He denied lying to obtain his release. On cross-examination, Mr. Hunley testified that he was charged with and pleaded guilty to three counts of robbery and to four counts of theft.

Former Knoxville Police Department (KPD) crime scene technician Beth Goodman identified the crime scene photographs she took on April 10, 2013. The photographs depicted the general area and Mr. Colbert, who was found inside the large tent. Ms. Goodman stated that photographs showed blood inside the tent and hair in Mr. Colbert's hand. She said that duffle bags, backpacks, and shoes found inside the tent were seized and that swabs of the blood found inside the tent were sent to a laboratory for analysis. She said she returned to the scene on April 12 to recover a piece of wood for the medical examiner.

Ms. Goodman testified that she returned to the crime scene when Ms. Standridge was recovered from under an abandoned building, which she estimated was approximately one-fourth of one mile from where Mr. Colbert was found. Photographs showed a blanket covering Ms. Standridge and large rocks and gravel under the blanket.

Ms. Goodman identified a photograph of a pile of wood located near the large tent and testified that the medical examiner wanted to know if there were any pieces of wood at the scene that could have been used as a weapon. She identified a backpack found inside the

-8-

large tent and said the bag contained a prescription bottle reflecting codefendant Warvi's name. Ms. Goodman identified a green duffle bag found inside the same tent and said the bag contained documents containing the Defendant's name. She identified a blue duffle bag found outside the same tent and said the bag had reddish-brown stains on it and contained a bus ticket from West Virginia to Knoxville. She identified a gold-colored bag found outside the same tent and said the bag contained a wallet, two library cards, a driver's license, a Social Security card, an MP3 player, and a lighter. She identified fingernail scrapings from the Defendant and codefendant Roberts, buccal swabs from the Defendant's right and left hands, and buccal swabs from Ms. Colson, codefendant Roberts, and codefendant Warvi. Ms. Goodman identified a second green duffle bag that was found under Mr. Colbert.

KPD crime scene technician Rachel Warren testified that she responded to the scene on April 12, 2013, and that she recovered evidence relative to Mr. Gorny. She identified photographs of Mr. Gorny, which showed that he was partially covered by black and blue tarps. She said she collected the tarps, two pairs of sunglasses, brown boots found beside Mr. Gorny, and a Social Security card belonging to Mr. Colbert. She said that blankets, a tent, a sleeping bag, and items from the campfire area were recovered. She identified a photograph of the campfire area and said it looked as though clothes and paper had been burned.

KPD crime scene technician Timothy Schade testified that he recovered evidence from the crime scene, including buccal swabs and fingernail scrapings from the Defendant and his Sketchers shoes and clothes. Mr. Schade identified photographs he took of the tent containing Mr. Colbert, including reddish-brown stains inside. He identified additional photographs of a smaller tent containing multiple blankets. He identified photographs of the Defendant, codefendant Warvi, codefendant Roberts, and Ms. Colson taken on the day of their arrests. Officer Schade stated that the photographs showed that the Defendant had scratch marks on his stomach, back, right shoulder, and left arm.

On cross-examination, Officer Schade testified that photographs of codefendant Roberts showed he had multiple tattoos and scratches on his back. Officer Schade said that although he obtained fingernail scrapings from the Defendant and codefendant Roberts, none were obtained from Ms. Colson and codefendant Warvi.

KPD Investigator A.J. Loeffler testified that he and Investigator Amy Jinks investigated the victims' deaths and that on April 10, 2013, he interviewed the Defendant, codefendant Roberts, and Ms. Colson. Investigator Loeffler stated that the Defendant was coherent, articulate, and cooperative. A recording of the Defendant's statement was received as an exhibit and played for the jury.

In the recording, the Defendant stated that he was from New York and had been in Knoxville since December 31, 2012. He said that he had been staying in Athens, Tennessee,

with a girlfriend but that the relationship ended, and he became homeless. He said that he had been staying in the area where the police found him for a couple of days. He said that many tents could be found in the area and that the tent in which he and the others were found had been abandoned when they began camping there. He said that he, Ms. Colson, codefendant Warvi, and codefendant Roberts arrived at the tent around 3:00 or 4:00 p.m. the previous day. He said that the group looked inside the tent to determine if anyone was inside, that he saw blankets, that nobody was inside, that they started a fire, that they bought and ate hotdogs, and that they went to sleep inside the tent. He said that he awoke when someone stated police officers were outside the tent.

The Defendant initially denied knowing Mr. Colbert, but after officers identified Mr. Colbert as "the dead guy," the Defendant said he did not recall when Mr. Colbert arrived and denied knowing him personally. When officers asked if Mr. Colbert "happened upon" the Defendant's group, the Defendant said, "It was the four of us as far as I know. What happened in that tent or whatever before, I don't know." After an officer pressed the Defendant to provide a truthful statement, the Defendant stated that he would stop the interview if the officer called him a liar. The officers stated that they did not think the Defendant killed Mr. Colbert but that they knew the Defendant was present when the killing occurred. The Defendant responded that "everything [was] like a blur. I just remember her doing her stuff, and me falling asleep."

The Defendant stated that many people frequented the area where the tent was located, that Mr. Colbert stopped by the tent, and that Mr. Colbert, the Defendant, codefendants Warvi and Roberts, and Ms. Colson drank alcohol. The Defendant said that he left to find firewood, that Mr. Colbert lay in the tent when the Defendant returned, and that codefendants Warvi and Roberts and Ms. Colson were talking to a man, who attempted to burn down the man's tent. The Defendant said that he, codefendants Warvi and Roberts, and Ms. Colson sat around the fire and talked for a while and that the Defendant went to sleep inside the tent.

The officers told the Defendant that "everybody" was "pointing fingers" at the Defendant and codefendant Roberts. The Defendant said that he did not know anything was going to happen. The Defendant stated that before he left to find firewood, codefendant Roberts and Mr. Colbert talked, although the Defendant denied knowing the subject of the conversation. The Defendant denied doing anything to Mr. Colbert and knowing why anyone would blame the Defendant for Mr. Colbert's death. The Defendant said that he did not know how much pressure was required to choke someone and denied that his DNA would be found on Mr. Colbert's neck, arms, and legs. The Defendant denied knowing Mr. Colbert had been deceased inside the tent and said he thought Mr. Colbert was asleep.

-10-

The Defendant denied knowing what occurred inside the tent when the officer implied that the Defendant was scared of codefendant Roberts. The officer told the Defendant that the Defendant went inside the tent and slept, although the Defendant knew Mr. Colbert was deceased and that the Defendant's denials of knowing what occurred made it look as though the Defendant participated in the killing or was "covering for" someone. The Defendant said that when codefendant Roberts and Mr. Colbert were inside the tent, the Defendant heard "fighting," which he described as "pushing back and forth." The Defendant said that after the fighting ended, codefendant Roberts returned to the campfire and drank one beer without talking much. The Defendant said that codefendant Roberts must have killed Mr. Colbert.

The Defendant stated that Ms. Colson and Mr. Colbert were inside the tent alone at some point for about forty-five minutes, that the Defendant thought they were "messing around," and that what occurred between them was none of his business. The Defendant said that Ms. Colson left the tent and told Mr. Colbert to go to sleep, that the Defendant sat by the fire, and that codefendant Roberts entered the tent. The Defendant said that he heard fighting from inside the tent but that it did not sound like they were pushing each other. The Defendant said that codefendant Roberts left the tent and told everyone to go to sleep and that everyone went to sleep inside the tent.

The Defendant stated that he did not know whether Mr. Colbert was still inside the tent when the police arrived and that it was common for people to enter and to leave tents frequently. He denied being a gang member and having tattoos. The officers asked the Defendant to lift his shirt and noticed the Defendant had scratches on his back. The Defendant explained that he had walked through the woods, and he consented to the officers' obtaining a DNA sample.

Investigator Loeffler testified that at the time of the Defendant's interview, the police only had knowledge of one homicide. He stated that the Defendant did not mention Mr. Gorny's and Ms. Standridge's deaths during the interview.

Investigator Loeffler testified that on April 11, 2013, he received information about a second homicide victim, who was later identified as Mr. Gorny, and that as a result, he interviewed Ms. Colson again. Investigator Loeffler said that the information Ms. Colson provided led the police to Ms. Standridge.

KPD Investigator Amy Jinks testified that she first interviewed codefendant Warvi, who was quiet, nervous, and "antsy." Investigator Jinks said that she interviewed Ms. Colson, who was calm but spoke rapidly, and the Defendant, who was calm. Investigator Jinks said the women and the Defendant were sober, coherent, and understood her questions.

-11-

She said the Defendant stated numerous times that he did not know what she was talking about and that he had been intoxicated.

Investigator Jinks testified that on April 11, 2013, she interviewed Mr. Estler, who called 9-1-1 to report finding Mr. Gorny's body. She said that the investigation showed that Mr. Gorny had been with the Defendant, codefendants Warvi and Roberts, and Ms. Colson in the days before Mr. Gorny's death.

Investigator Jinks identified photographs of the contents of codefendant Warvi's two bags that were found inside the tent in which Mr. Colbert was discovered. Investigator Jinks said the bag contained a prescription bottle and hospital discharge documents dated April 8. Investigator Jinks identified photographs of the contents of codefendant Roberts's bag, which included a bus ticket from West Virginia to Knoxville and letters addressed to codefendant Roberts regarding felony convictions for which he received probation. Investigator Jinks identified photographs of the contents of the Defendant's bag, which included a paycheck stub, tax documents, a receipt reflecting the Defendant's name, the Defendant's driver's license, and the Defendant's Social Security card. Investigator Jinks identified Mr. Gorny's duffle bag, which was found near Mr. Colbert inside the tent.

Investigator Jinks testified that after Mr. Gorny was discovered, she interviewed Ms. Colson again and that based upon information Ms. Colson provided, the police found Ms. Standridge on April 11. Investigator Jinks said she also interviewed Mr. Holmes, who was Ms. Standridge's boyfriend. Investigator Jinks said that she spoke with Mr. Underhill, who owned the smaller tent found at the scene, and that she excluded him as someone involved in this case.

Investigator Jinks testified that a suitcase at the scene contained items belonging to Ms. Standridge and that Ms. Standridge's glasses were found inside the small tent owned by Mr. Underhill. Investigator Jinks said that in the campfire area, she found pieces of clothes and that Mr. Colbert's Social Security card was found in the general area. Investigator Jinks stated that in late May or early June of 2013, she received information about the three killings from two female jail inmates.

On cross-examination, Investigator Jinks testified that she interviewed Ashley Turner and Kim Sutton, who were inmates at the jail with codefendant Warvi. Investigator Jinks said that she did not recover the pants Ms. Warvi wore when Mr. Colbert urinated during the killing. Investigator Jinks said that Ms. Colson was not initially charged with a crime but was later charged with being an accessory after the fact relative to the killings. Investigator Jinks thought that the charge against Ms. Colson was later dismissed after Ms. Colson was found incompetent to stand trial and to testify.

Tennessee Bureau of Investigation (TBI) Agent Kim Lowe, a serology expert, testified that she analyzed buccal swabs, hand swabs, fingernail scrapings, clothes, and shoes from the Defendant. She also analyzed buccal swabs, neck swabs, penile swabs, fingernail clippings, and blood from Mr. Gorny. She determined that Mr. Gorny's blood and DNA were on the Defendant's right shoe. Agent Lowe analyzed anal and vaginal swabs obtained from Ms. Standridge. Agent Lowe determined that the vaginal swab showed the presence of codefendant Roberts's DNA and that the anal swab showed a mixture of the Defendant's and codefendant Roberts's DNA. Her report was received as an exhibit.

On cross-examination, Agent Lowe testified that the penile swab obtained from Mr. Colbert showed a mixture of genetic material, which included Mr. Colbert's and Ms. Colson's DNA. Agent Lowe said that Mr. Colbert's right fingernail scrapings showed a mixture of Mr. Colbert's and Ms. Colson's DNA and that Mr. Colbert's left fingernail scrapings showed a mixture of genetic material but that only Mr. Colbert's DNA was identifiable.

Agent Lowe testified that Ms. Standridge's right fingernail scrapings showed a mixture of genetic material from Ms. Standridge and codefendant Roberts and that the analysis of her left fingernail scrapings was inconclusive. Agent Lowe said that buccal swabs from Ms. Standridge's mouth showed the presence of spermatozoa matching codefendant Roberts's DNA. Agent Lowe said that neck swabs from Ms. Standridge were inconclusive.

Agent Lowe testified that the Defendant's and codefendant Roberts's fingernail scrapings showed only their respective DNA and that the Defendant's hand swab did not show the presence of blood. She said that the Defendant's pants, shirt, and left shoe did not show the presence of blood. She stated that Mr. Gorny's blood and DNA, Ms. Standridge's DNA, and codefendant Robert's DNA were found on codefendant Roberts's pants. Agent Lowe stated that codefendant Warvi's sweatshirt showed the presence of Mr. Colbert's blood and DNA and codefendant Warvi's DNA. Agent Lowe stated that Mr. Colbert's boxer shorts, shoes, and socks did not show the presence of blood but that Mr. Colbert's shirt showed the presence of Mr. Colbert's blood and DNA and Ms. Colson's DNA.

Deputy Chief Medical Examiner Steven Cogswell, an expert in forensic pathology, testified that he performed the victims' autopsies. Dr. Cogswell determined that Mr. Colbert was strangled and suffered multiple blunt force injuries to the head, neck, and torso. Dr. Cogswell said that Mr. Colbert had abrasions and contusions on the face, "deeper injuries in the muscles on the side of the head," injuries to the structures in the neck, and rib fractures. Dr. Cogswell stated that Mr. Colbert did not have injuries to his hands and forearms and concluded that Mr. Colbert probably did not attempt to defend himself or that Mr. Colbert's

arms were controlled by someone while another person strangled him. Dr. Cogswell stated that Mr. Colbert had bruises and contusions on the forehead, nose, cheeks, and upper lip.

Dr. Cogswell testified that the muscle under Mr. Colbert's scalp showed bleeding in a "four by three inch area" and that Mr. Colbert's brain was swollen, which was expected in a strangulation or slow respiratory death. Relative to Mr. Colbert's neck, Dr. Cogswell said that the injuries were internal, that the hyoid bone was fractured, and that the injuries were caused by a significant amount of force. Dr. Cogswell stated that Mr. Colbert had multiple rib fractures and that the chest cavity contained a small amount of blood. He concluded that Mr. Colbert did not live long after the fractures occurred. Dr. Cogswell noted small contusions on the left elbow, knees, and shins and determined that the injuries occurred around the time of death. Dr. Cogswell determined that Mr. Colbert had been deceased for about one day at the time of the autopsy. He stated that manual strangulation took at least "a few minutes" but could take "significantly longer," depending upon whether a victim struggled and the amount of pressure applied.

Dr. Cogswell identified photographs showing Mr. Colbert's external injuries. He identified a photograph of Mr. Colbert's eye, which Dr. Cogswell stated showed "congestion." He said that although petechial hemorrhages were consistent with strangulation, the eyes did not show the "pinpoint bleedings" associated with strangulation. He noted a sclera hemorrhage in the left eye and said that the hemorrhage was blood leaking into the eye, based upon the amount of bruising around the cheek area. He noted that Mr. Colbert's back showed no injuries.

Dr. Cogswell testified that the blood found under Mr. Colbert's head most likely came from the mouth or the nose after the larynx and the hyoid bones were fractured. He said that Mr. Colbert's injuries did not produce much external bleeding. He said that Mr. Colbert had a blood alcohol concentration (BAC) of 0.15% and that urination during a slow death, such as strangulation, was common.

Dr. Cogswell testified that he performed Mr. Gorny's autopsy on April 12, 2013, and that Mr. Gorny had extensive head injuries, including a contusion covering the left side of the head between the eye and ear. Dr. Cogswell stated that three semi-circular lacerations were visible on the right side of the scalp. Dr. Cogswell stated that abrasions were on the back of the ear, left side of the neck, back of the head, and around the eyes, that hemorrhages were found under the scalp, and that most of the internal injuries were to the neck. He said that the hyoid bone was not fractured but that the horns on the hyoid bone were fractured, which he determined was the result of pressure applied to the neck. Dr. Cogswell determined that the muscles in the back of the neck showed hemorrhaging at the base of the neck and top of the shoulders and noted that the hemorrhaging was deep in the muscle at the spine. Dr. Cogswell said that the torso showed abrasions to the collar bone, shoulder,

-14-

abdomen, back, and elbow but that he saw no evidence of rib fractures or injuries to the hands.

Dr. Cogswell testified that Mr. Gorny had injuries around the entire head but had no defensive wounds. Dr. Cogswell determined, based upon the amount of decomposition, that Mr. Gorny had been deceased for about two days when the body was recovered. Dr. Cogswell concluded, though, that Mr. Gorny and Mr. Colbert died around the same time. Dr. Cogswell stated that the lack of defensive wounds on the arms was consistent with one person strangling Mr. Gorny and another person holding Mr. Gorny's arms. Dr. Cogswell determined that the cause of death was strangulation and blunt force trauma, which was identical to Mr. Colbert's cause of death.

Dr. Cogswell identified photographs showing Mr. Gorny's external injuries. He identified a photograph showing a piece of pallet wood that the police provided to him in an effort to identity the object causing the semi-circular lacerations on the right side of the scalp. The wooded board had two nails protruding from it, and Dr. Cogswell said that "it was thought that [it] might be a match." He said that although the wood was consistent with causing the injury, it was not a "perfect match." He said that the toxicology report showed Mr. Gorny had sub-therapeutic levels of Paxil in his system and had a BAC of 0.18%.

Dr. Cogswell testified that on April 13, 2013, he performed Ms. Standridge's autopsy. He said that Ms. Standridge's injuries were centered on the head and neck and indicated she had been strangled. He said that bruises and contusions were visible on the face, breasts, chest, eyebrows, and upper arms. He said the injuries to the upper arms were consistent with having been dragged or held. He said that Ms. Standridge had black eyes and abrasions on the nose, chin, and lower lip. Dr. Cogswell stated that Ms. Standridge had abrasions behind the ears and had petechial hemorrhages on the side of the throat, which indicated that a significant amount of pressure was applied to the throat. He said that the hemorrhaging in the neck muscles extended downward through all of the muscles to the spine and that hemorrhaging was slightly visible in the back of the neck. Dr. Cogswell distinguished Ms. Standridge's and Mr. Gorny's neck injuries, determining that Mr. Gorny was pressed against the ground but that thumbs and fingers pushed down on Ms. Standridge's neck.

Dr. Cogswell testified that Ms. Standridge had bruises on her arms, armpits, right buttock, and thighs. He noted drag-mark abrasions on the front of the thighs but could not determine whether the injury occurred before or after death. He determined, though, that the injuries were fresh with no evidence of healing. Although he could not determine definitively Ms. Standridge's position at the time of the strangulation, he believed she lay face down based upon the bruises. He determined two people possibly assaulted Ms. Standridge. He said that the toxicology report showed a BAC of 0.16%.

Dr. Cogswell identified photographs taken during Ms. Standridge's autopsy and testified that Ms. Standridge arrived at the medical examiner's office wearing no clothes. He said that "pressure marks" from the stones found on top of Ms. Standridge caused abrasions.

On cross-examination, Dr. Cogswell testified that although it was possible multiple assailants attacked Ms. Standridge, it was likewise possible that one person attacked multiple areas of her body sequentially. He could not determine definitively whether multiple assailants were involved.

Upon this evidence, the Defendant was convicted of first degree premeditated murder of Mr. Colbert, second degree murder of Mr. Colbert, first degree premeditated murder of Ms. Standridge, first degree felony murder of Ms. Standridge, second degree murder of Ms. Standridge, and criminally negligent homicide of Mr. Gorny. The trial court merged the second degree murder conviction with the first degree murder conviction relative to Mr. Colbert, and imposed a life sentence. The court also merged the first degree felony murder and second degree murder convictions with the first degree premediated murder conviction of Ms. Standridge and imposed a concurrent life sentence. The Defendant received a concurrent two-year sentence for the criminally negligent homicide conviction relative to Mr. Gorny. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his first degree premediated murder convictions because the evidence of premeditation rests upon the uncorroborated accomplice testimony of codefendant Warvi. The Defendant does not challenge his first degree felony murder, second degree murder, and criminally negligent homicide convictions. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). In order for accomplice testimony to be adequately corroborated:

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw,* 37 S.W.3d at 903.

Regarding the question of whether a person is an accomplice,

> the term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice, he must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission. An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged."

The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory.

*Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 *Wharton's Criminal Evidence* § 448 (12th ed. 1955)). A person is not deemed an accomplice simply because he or she was present at the crime scene. *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974); *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); *see* T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id.* (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

The record reflects that the trial court determined as a matter of law that codefendant Warvi was an accomplice to the offenses, and the parties do not challenge the court's determination. Therefore, her testimony required independent corroboration, and we conclude that sufficient corroboration was presented to support the Defendant's first degree premeditated murder convictions.

In the light most favorable to the State, the evidence relative to the killing of Mr. Colbert shows that after the assault resulting in Mr. Gorny's death, codefendant Warvi saw the Defendant and codefendant Roberts talking privately away from the remainder of the group, which included Mr. Colbert, Ms. Colson, Ms. Standridge, and codefendant Warvi. Codefendant Warvi said that codefendant Roberts called for her to come to him and the Defendant, that she complied, and that the Defendant stated, "We're going to have to kill

them." Codefendant Warvi thought the Defendant meant they needed to kill the others because they knew Mr. Gorny was dead. After the discussion, codefendant Warvi said that codefendant Roberts directed Ms. Colson to have sexual intercourse with Mr. Colbert in an effort to facilitate the killing of Mr. Colbert and that the Defendant, codefendant Roberts, and Ms. Standridge entered the smaller tent nearby. Codefendant Warvi attempted to sleep inside the large tent and pretended to be asleep when Ms. Colson and Mr. Colbert began having sexual relations inside the tent.

Afterward, codefendant Warvi left the large tent, walked to the smaller tent to find the Defendant, and saw Ms. Standridge and codefendant Roberts lying naked and the Defendant "hunched over" inside the tent. Codefendant Warvi left the small tent and walked to the campfire, where Ms. Colson was sitting while Mr. Colbert lay asleep inside the large tent. A few minutes later, the Defendant and codefendant Roberts walked to the campfire and told codefendant Warvi to enter the large tent in which Mr. Colbert slept. Inside the tent, she and the Defendant held Mr. Colbert's arms as instructed by codefendant Roberts, and codefendant Roberts assaulted and strangled Mr. Colbert. Codefendant Warvi said that the Defendant and codefendant Roberts each hit and strangled Mr. Colbert and that she placed her hands arounds Mr. Colbert's neck for about thirty seconds. She said that Mr. Colbert urinated when he died, although she believed Mr. Colbert died before she placed her hands on his throat.

Forensic analysis showed a mixture of Mr. Colbert's and Ms. Colson's DNA on Mr. Colbert's penis and shirt. Mr. Colbert's cause of death was strangulation and blunt force trauma to the head, neck, and torso. Mr. Colbert suffered facial abrasions and contusions, injuries to the neck structures, and rib fractures. His brain was swollen, which Dr. Cogswell determined was consistent with strangulation or slow respiratory death. Dr. Cogswell concluded that Mr. Colbert did not have defensive wounds to his hands and forearms, which was consistent with someone controlling Mr. Colbert's arms while another person strangled him, and that Mr. Colbert had no injuries on his back. Photographs from the crime scene show Mr. Colbert lying on his back inside the tent.

Relative to Ms. Standridge's killing, codefendant Warvi testified that Ms. Standridge and Mr. Holmes were at the campsite on the night of the killing. During the evening, Ms. Standridge and Mr. Holmes had an argument because Ms. Standridge wanted to end their romantic relationship. The argument culminated in Mr. Holmes' burning his and Ms. Standridge's tent, remnants of which were found by the police. Mr. Holmes left the area before Mr. Gorny's death. At the time codefendant Warvi, Ms. Colson, and Mr. Colbert were inside the large tent, the Defendant, Ms. Standridge, and codefendant Roberts entered a small tent nearby. After Mr. Colbert and Ms. Colson finished having sexual relations, codefendant Warvi walked to the small tent to find the Defendant, and Ms. Warvi saw the Defendant "hunched over" and codefendant Roberts and Ms. Standridge lying naked inside

the tent. Codefendant Warvi walked to the campfire where Ms. Colson was sitting, and a few minutes later, the Defendant and codefendant Roberts emerged from the small tent, without Ms. Standridge, and instructed codefendant Warvi to enter the tent in which Mr. Colbert slept.

After Mr. Colbert's killing inside the large tent, the Defendant and codefendant Roberts instructed codefendant Warvi to burn Ms. Standridge's clothes and wallet, and the Defendant and codefendant Roberts returned to the small tent. Codefendant Warvi said that the Defendant told her and Ms. Colson to assist codefendant Roberts in the small tent. Codefendant Warvi saw Ms. Standridge wrapped in blankets, and the four of them carried Ms. Standridge to the bottom of an abandoned building. Codefendant Warvi recalled that the Defendant and codefendant Roberts began throwing rocks on top of Ms. Standridge in an effort to conceal her but that they decided to cover Ms. Standridge with a gray blanket instead to save time.

Forensic evidence showed the Defendant's DNA on Ms. Standridge's anus and codefendant Roberts's DNA on Ms. Standridge's vagina. Ms. Standridge's cause of death was strangulation and blunt force trauma, and she suffered contusions to her face, breasts, and chest. Dr. Cogswell determined that bruises on her upper arms were consistent with having been dragged or held and that drag-mark abrasions were on the front of her thighs. Dr. Cogswell concluded that significant pressure was applied to her neck based upon the abrasions behind the ears and the petechial hemorrhages on the throat. Photographs of the crime scene show that Ms. Standridge was naked and covered with a gray blanket. Photographs also showed that she was partially covered with large rocks before the blanket was placed over her, and Dr. Cogswell determined that those rocks caused "pressure marks" and abrasions. Crime scene technician Rachel Warren testified that clothes and paper appeared to have been burned in the campfire.

Codefendant Warvi testified that the Defendant was calm and did not express any remorse for the killings. Codefendant Warvi, the Defendant, codefendant Roberts, and Ms. Colson slept in the tent in which Mr. Colbert lay deceased after the three killings. Codefendant Warvi said that the Defendant and codefendant Roberts walked to a store the next day and purchased alcohol with money the Defendant removed from Mr. Colbert's wallet. Investigator Jinks testified that the Defendant was calm during the police interview. Mr. Hunley testified that he spoke to the Defendant while they each waited for their respective court hearing and that the Defendant admitted "he did two people." Photographs taken at the time of the Defendant's arrest showed scratch marks on his stomach, back, right shoulder, and left arm.

We conclude that the evidence is sufficient to support the Defendant's first degree premediated murder convictions relative to Mr. Colbert and Ms. Standridge and that codefendant Warvi's testimony was sufficiently corroborated by independent evidence.

-20-

Although the Defendant does not challenge his remaining convictions, we, likewise, conclude that the evidence is sufficient to support the convictions. The Defendant is not entitled to relief on this basis.

The judgment of conviction for second degree murder relative to Mr. Colbert reflects that the offense is first degree murder. Therefore, we remand for the limited purpose of correcting the judgment to reflect that second degree murder is a Class A felony.[2]

## II.     Warrantless Entry & Police Statement

The Defendant contends that the trial court erred by denying his motion to suppress evidence obtained from inside the tent as a result of the police's warrantless entry. The Defendant also challenged the admissibility of his police statement because he alleged he invoked his right to remain silent. The State responds that the trial court did not err by denying the motion to suppress. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

---

[2] We note that the second degree murder conviction related to Mr. Colbert and the first degree felony murder and second degree murder convictions related to Ms. Standridge were merged into the respective first degree premediated murder convictions and that these judgment forms do not reflect sentences. Our supreme court has determined that "[w]hen the jury returns guilty verdicts on multiple offenses that eventually will be merged, the best practice is for the trial court to impose a sentence on each count and [to] reflect the sentence on the respective uniform judgment document. Because the documents also reflect the merger, the sentence has no immediate effect. However, in the event the greater conviction is reserved on appeal, the parties are spared the necessity of an additional sentencing hearing." *State v. Berry*, 503 S.W.3d 360, 365 (Tenn. 2015) (order).

At the suppression hearing, KPD Officer David Gerlach testified consistently with his trial testimony relative to responding to the scene where Mr. Colbert was discovered. He said that the tent in which the Defendant was found was located on the "old PCS Metals building" property, that no trespassing signs were posted on the property, and that homeless people frequently camped on the property. He said that Officers Brandon Shelly, Carl Kennedy, and Cody Fritz responded to the scene, that they talked to other homeless people in the area to locate the person with Nazi tattoos and the person with pink hair as described by the 9-1-1 caller, and that the officers were directed to the tent in which the Defendant was found.

Officer Gerlach testified that he "knocked" on the tent and announced himself, that nobody responded, that he unzipped the tent, and that he saw four people inside. He stated that he asked everyone if they "mind[ed] stepping out" and that everyone inside voluntarily stepped out of the tent. He said that when he was outside the tent, he noticed a "silhouette of a body" on the right side of the tent, that he told the person to come outside, and that the person did not respond. Officer Gerlach said that he did not know if the person had a weapon or was intoxicated and that as a result, he entered the tent, nudged the person with his foot, and pulled back the blanket when the person did not move. He said that he saw Mr. Colbert, who was deceased, that he saw blood under Mr. Colbert's head, and that he secured the tent. He said that the blanket covering Mr. Colbert was tucked under and around Mr. Colbert's head, which the officer found suspicious.

Officer Gerlach testified that he and Officer Shelly obtained general information, including names and birthdates, of everyone who had been inside the tent. He denied that the Defendant and the others were interrogated and said that he reported finding Mr. Colbert, waited for the investigators to arrive, and transported codefendant Roberts to the police station. Officer Gerlach stated that the Defendant and codefendants Roberts and Warvi were calm and collected while everyone waited for the investigators to arrive but that Ms. Colson, who had pink hair, cried and looked distraught.

On cross-examination, Officer Gerlach testified that he and the officers spoke to two people who knew the general location of the tent and that Officer Shelly spoke to a third person, who knew the specific tent in which the people matching the description provided by the 9-1-1 caller were staying. Officer Gerlach recalled at least two other tents in the vicinity. He said that they focused on the tent in which the Defendant was found based upon one person's telling him that the people, who matched the descriptions provided by the 9-1-1 caller, stayed in a particular area, that he went in the general area, and that he focused on the tent. He said that he did not hear anyone inside the tent, that he announced himself, and that he unzipped the tent when nobody responded. He agreed that he did not have a search warrant but said that "any subject on the property is considered trespass[ing]." He said that a tent was not a permanent dwelling, that the tent was on the property unlawfully, and that

-22-

officers "have to address the people who are there illegally." He said that the police had spoken to the property owner previously about homeless campsites on the property but that he could not recall if the discussion occurred before or after this incident.

Officer Gerlach testified that after the Defendant and the others exited the tent, he entered the tent because he saw the silhouette of another person and that nobody gave him permission to enter the tent. He said that the Defendant was taken to the police station for an interview, that the Defendant was not handcuffed, and that the Defendant was not free to leave. Officer Gerlach said the Defendant did not object to going to the police station.

KPD Investigator Amy Jinks testified that when she arrived at the scene, two men and two women sat around the remnants of a campfire and that a deceased person lay inside the tent. She said that the area was not conducive for police interviews, that an officer drove the Defendant to the police station, and that the Defendant was not handcuffed. She said that on April 10, 2013, she read the Defendant's *Miranda* rights before she began questioning him and that he signed a waiver of rights form. She recalled the Defendant was calm and tired and said he yawned frequently and commented he was tired. She said the Defendant spoke clearly and did not appear intoxicated. She said he understood her questions and appeared to have at least average intelligence. She denied the Defendant asked for an attorney at any time and said he appeared willing to answer her questions after signing the waiver of rights form.

Investigator Jinks testified that she received information the following day from another investigator about a passerby's finding a second deceased person at the campsite and that she returned to the scene. She said that Mr. Gorny was found under a large pile of trash beside the tent in which Mr. Colbert was found. She said that it was dark outside when the Defendant and the others were transported to the police station the previous night and that she and the other officers were unaware a second victim was at the scene. She said that Mr. Gorny's death was suspicious based upon a head injury and his being covered by a pile of trash. She said that after Mr. Gorny was discovered, she interviewed Ms. Colson again and that Ms. Colson's information led the police to Ms. Standridge. Investigator Jinks said that after Mr. Gorny and Ms. Standridge were discovered, she attempted to speak with the Defendant on April 12, that the Defendant stated he had an attorney, and that she ended the interview.

On cross-examination, Investigator Jinks testified that trash and rats were everywhere at the scene. She said that the police needed to talk to each person who was inside the tent to determine what happened to Mr. Colbert, that the Defendant did not ask if he could leave the scene, and that she would have interviewed the Defendant at the scene had he asked to leave. She agreed that during the initial interview, she told the Defendant that she did not think he

-23-

was telling the truth and that although she did not recall the Defendant's specific words, she recalled the Defendant's stating that he thought he did not want to talk to her anymore. She said, though, the Defendant never asked for an attorney. When her recollection was refreshed, she said the Defendant responded, "I mean if you're going to say I'm a liar, I'm going to stop talking." She said she continued talking to the Defendant because he did not invoke his right to remain silent or request an attorney. She agreed that after the Defendant's statement, Investigator Loeffler told the Defendant to be truthful about Mr. Colbert's death.

Investigator Loeffler testified that the scene was not conducive to interviewing the Defendant and the others because the area was not well lit and "things scurrying around the campsite" made him uncomfortable. He said that he asked the Defendant and the others to accompany him to the police station, that the Defendant was not handcuffed, and that he and Investigator Jinks interviewed Ms. Colson before the Defendant. Investigator Loeffler stated that the Defendant was coherent, answered questions, and showed no apparent signs of intoxication. Investigator Loeffler said the Defendant signed the waiver of rights form. The Defendant's statement was played for the trial court.

Investigator Loeffler testified that he learned later that two more victims were near the campsite, that he attempted to interview the Defendant again, and that the Defendant invoked his right to counsel. Investigator Loeffler said that after the Defendant invoked his right to counsel, Investigator Loeffler explained that the police had found two more victims and asked if the Defendant had any questions about what would happen next.

On cross-examination, Investigator Loeffler recalled the Defendant's stating that he would stop talking to the police if Investigator Jinks was going to call him a liar. Investigator Loeffler denied that he interrupted the Defendant at that time, although he agreed Investigator Jinks had led the interview until the Defendant's statement.

Investigator Loeffler testified that generally, he continued talking when a person invoked his or her right to remain silent. He said he told the person that he or she did not have to talk anymore, what the police knew about the case, and what would happen next in the investigation. He denied that he had called the Defendant a liar before the Defendant stated that he would stop talking if the officers called him a liar.

Relative to the warrantless entry, the State argued that the Defendant did not have standing to challenge the police officer's entry into the tent, which led to the discovery of Mr. Colbert. The prosecutor argued that the Defendant was trespassing and was inside a tent not owned by him and that he voluntarily left the tent upon request. The defense argued that the search of the tent, resulting in the discovery of Mr. Colbert, violated the Defendant's right against unreasonable searches and seizures. The defense sought the exclusion of Mr. Colbert's body and any evidence attendant to the discovery of Mr. Colbert inside the tent. Relative to the Defendant's statement, the prosecutor argued that he did not invoke his right

to remain silent. The defense argued that he invoked his right to remain silent when he stated that he would stop talking if the officers were going to call him a liar and that, as a result, any statement after the invocation should have been suppressed.

The trial court questioned trial counsel about whether the Defendant had standing to challenge the search of the tent. The court found that the tent was located on private property, which contained visible no trespassing signs to anyone who entered the property. Trial counsel agreed. The court stated that no proof was presented showing who owned the tent, who had a possessory interest in the tent, and who had any reasonable expectation of privacy within the tent. The court found that the proof showed that the Defendant and the others "just . . . showed up to put his head down there for the night" and that no evidence showed the Defendant lived in the tent. The court found that the Defendant stated in his police interview that the Defendant "came into the tent and he basically was drunk and fell down and passed out [and] went to sleep in the tent." The court found that no evidence showed that the tent was zipped to exclude others from entering it.

The trial court determined that the Defendant did not have standing to contest the discovery of Mr. Colbert. The court found that the tent was on private property with no trespassing signs, that the police were responding to a 9-1-1 call regarding outstanding felony

arrest warrants, and that the police had responded to previous trespassing calls on the property. The court determined that no evidence showed the Defendant had a reasonable expectation of privacy within the tent.

Relative to the Defendant's police interview, the trial court determined that the Defendant did not unequivocally invoke his right to remain silent. The court found that the Defendant stated that if the officer were going to call him a liar, he would stop talking to the officer and determined that this statement was equivocal, based upon the totality of circumstances. The court denied the motion to suppress.

## A.    Warrantless Entry into the Tent

The Defendant alleges that he had a reasonable expectation of privacy inside the tent in which Mr. Colbert was found and that, as a result, the police officer's warrantless entry was unlawful. The State responds that the trial court did not err by determining that the Defendant lacked standing to challenge the search and had no reasonable expectation of privacy inside the tent.

The Fourth Amendment to the United States Constitution and article I, section 7 of the

Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). In order to challenge the reasonableness of a search or seizure, a defendant "must have a legitimate expectation of privacy in the place or thing to be searched." *State v. Cothran*, 115 S.W.3d 513, 520-21 (Tenn. Crim. App. 2003); *see State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001). When considering whether a defendant has standing to challenge a search or seizure, courts should consider the totality of whether a defendant "owns the property seized," "has a possessory interest in the thing seized," "has a possessory interest in the place searched," "has the right to exclude others from that place," "has exhibited a subjective expectation of privacy that the place would remain free from governmental invasion," has taken "normal precautions to maintain . . . privacy," and "was legitimately on the premises." *Ross*, 49 S.W.3d at 841; *see State v. Turnbill*, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982).

KPD Officer David Gerlach testified that based upon the 9-1-1 call, he and additional officers responded to the "old PCS Metals building" property in an effort to locate a person with possible outstanding felony warrants. Officer Gerlach stated that although a no trespassing sign was posted on the property, homeless people frequently camped on the property. The officers spoke to multiple homeless people in the area about the descriptions provided by the 9-1-1 caller, and the officers were directed to the large tent in which the Defendant, codefendant Roberts, codefendant Warvi, Ms. Colson, and Mr. Colbert were found. Officer Gerlach identified himself as a police officer, unzipped the tent, and saw four people inside and a silhouette of a person who was later determined to be Mr. Colbert. Officer Gerlach did not hear anyone inside the tent before and after he announced his presence, and he unzipped the tent. Officer Gerlach said that any person on the property was considered to be trespassing and that the police had spoken to the property owner previously about the homeless campsites, although he could not recall when the discussion occurred.

In his police statement, the Defendant stated that many tents were on the property and that the tent in which he and the others were found had been abandoned. The Defendant said that he and the others saw the tent, that they looked to determine if anyone was inside, that they saw blankets inside, that they started a fire, and that they went to sleep inside the tent. The Defendant said that it was common for people to enter and leave tents frequently and denied knowing what occurred inside the tent before he and the others found it.

The record reflects that the Defendant and the others happened upon the tent and began using it without determining who owned the tent and without the owner's consent.

Furthermore, the property on which the tent was located had visible no trespassing signs, and the defense conceded at the suppression hearing that the tent was located on private property upon which no trespassing signs were posted. The Defendant admitted during his police interview that he and the others began using the tent when they saw nobody inside and that he did not know what occurred inside the tent before he began camping there. Likewise, the Defendant stated that it was common for people to enter and to leave tents frequently. Therefore, the record does not preponderate against the trial court's findings that the Defendant was not legitimately on the property and did not have ownership or possessory interests in the tent or the property upon which the tent was located. Although the officer unzipped the tent, the evidence also does not preponderate against the court's findings that the Defendant had no right to exclude others from the tent and that the Defendant had no subjective expectation of privacy inside the tent. As a result, the trial court did not err by determining that the Defendant lacked standing to challenge the search and that the Defendant did not have a reasonable expectation of privacy. The Defendant is not entitled to relief on this basis.

## B.     The Defendant's Police Statement

The Defendant contends that he invoked his right to remain silent during his police interview but that the officers continued questioning him. He argues that his statement should have been suppressed on this basis. The State responds that the Defendant did not unambiguously invoke his right and that the trial court did not err by denying the motion to suppress.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect an individual from being compelled to provide evidence against himself or herself and afford the right to remain silent. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 9. If an individual invokes the right to remain silent, police questioning must end. *State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013). The invocation, however, of the right to remain silent must be unambiguous and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *see State v. Dotson*, 450 S.W.3d 1, 53 (Tenn. 2014).

The record reflects that Investigator Jinks read the Defendant his *Miranda* rights, that the Defendant signed a waiver of rights form, and that he agreed to speak with the police. Investigator Jinks said that the Defendant did not ask for an attorney at any time and that the Defendant appeared willing to answer her questions after signing the waiver form. During the police interview, Investigator Jinks told the Defendant that she did not believe the Defendant's initial version of events, and the Defendant responded, "I mean if you're going to say I'm a liar, I'm going to stop talking." Investigator Loeffler interjected, telling the Defendant to be truthful about Mr. Colbert's death, and the interview continued. The investigators continued confronting the Defendant about the truthfulness of his version of

-27-

events, and the Defendant continued speaking to them.

The Defendant's statement was not an unequivocal and unambiguous invocation of his right to remain silent. Rather, the statement was equivocal and conditional. The Defendant's statement was not an unequivocal expression of a desire to cut off further questioning by the investigators at that time but was an indication of what the Defendant would do if the investigators called him a liar. We conclude that the trial court did not err by denying the motion to suppress on this basis. The Defendant is not entitled to relief.

## III. Admission of Evidence

The Defendant contends that the trial court erred by admitting irrelevant, hearsay, and cumulative evidence. He argues that Ms. Colson's statements to the police were inadmissible hearsay and that their admission violated his confrontation rights. He asserts that a photograph and the medical examiner's testimony related to the wooden board recovered from the scene were inadmissible. He argues that multiple autopsy photographs were inflammatory and cumulative. The State responds that the trial court did not err by admitting the evidence.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

## A. Ms. Colson's Police Statement

Before the trial, the Defendant sought to exclude, on the grounds of inadmissible hearsay and confrontation rights, Ms. Colson's statement to the police that led the discovery of Ms. Standridge. The defense also sought exclusion of any derivative evidence, namely the discovery of Ms. Standridge, that the police obtained as a result of Ms. Colson's police statement. The prosecutor told the trial court that she did not intend to present as evidence any statement made by Ms. Colson to the investigating police officers. The prosecutor

conceded that Ms. Colson's statements would have been hearsay, although some of her statements might have qualified as exceptions to the rule barring the admission of hearsay evidence. The prosecutor noted that Ms. Colson had been deemed incompetent to testify and to stand trial but argued that the police officers could testify that their investigation led them to Ms. Standridge without introducing the substance of Ms. Colson's statements.

The trial court accepted the State's concession that it would not elicit testimony from the investigating officers about the substance of Ms. Colson's statements to the police. The court also determined that the admission of the derivative evidence the police obtained during the investigation, without mentioning the substance of Ms. Colson's police statements, did not violate the Defendant's confrontation rights.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. The Confrontation Clause provides a criminal defendant the right to confront and cross-examine witnesses. *See* U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *State v. McCoy*, 459 S.W.3d 1, 13-14 (Tenn. 2014), our supreme court said that Article I, section 9 of the Tennessee Constitution placed no additional restrictions on the admission of hearsay statements beyond the limits of the federal constitution, as explained in *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Thus, the same standards apply in interpreting a defendant's confrontation rights under the state and federal constitutions. *See State v. Hutchison*, 482 S.W.3d 893, 905) (Tenn. 2016). In analyzing whether an out-of-court statement is barred by the Confrontation Clause, inquiry begins with "whether the challenged statement is testimonial." *See id.*; *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014). The Confrontation Clause has no bearing on the admission of statements which are nontestimonial hearsay. *Hutchison*, 482 S.W.3d at 905-06 (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006)); *Dotson*, 450 S.W.3d at 63. Thus, the admissibility of a nontestimonial statement is determined by the traditional rules regarding the admission of hearsay evidence. *State v. Cannon*, 254 S.W.3d 287, 303 (Tenn. 2008); *see Davis*, 547 U.S. at 821.

In order for a testimonial statement to be admissible, the declarant must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-55; *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). However, the Confrontation Clause is not implicated when testimonial statements are not used to show the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9. Similarly, no Confrontation Clause violation occurs if the declarant is called as a trial witness and is subject to cross-examination regarding the declarant's prior testimonial statements. *See Dotson,* 450 S.W.3d at 73; *see also Crawford*, 541 U.S. at 59, n.9; *California v. Green*, 399 U.S. 149, 162 (1970).

At the trial, Investigator Loeffler testified that after the discovery of Mr. Gorny, he spoke to Ms. Colson again. Investigator Loeffler stated that the information Ms. Colson provided led the police to discover Ms. Standridge. The prosecutor did not elicit testimony from Investigator Loeffler about the substance of Ms. Colson's statement. Likewise, Investigator Jinks testified that after the discovery of Mr. Gorny, she spoke to Ms. Colson again. Investigator Jinks said that based upon her conversation with Ms. Colson, police officers were sent to the location where Ms. Standridge was found.

The record does not reflect that the State elicited hearsay evidence from Investigators Loeffler and Jinks. Both investigators testified that they spoke to Ms. Colson after Mr. Gorny was discovered and that after they spoke to Ms. Colson, the police discovered Ms. Standridge. Neither Investigator Loeffler nor Investigator Jinks provided an out-of-court statement made by Ms. Colson during her police interview. The rules prohibiting inadmissible hearsay evidence do not apply in this case without an out-of-court statement made by Ms. Colson offered for its truth. The evidence shows that the investigators spoke to Ms. Colson and that afterward, the police returned to the scene and found Ms. Standridge. The testimony reflects an interaction between the investigators and Ms. Colson, not Ms. Colson's statements. Furthermore, because the State did not offer hearsay evidence, the Defendant's confrontation rights were not violated. Therefore, we conclude that the trial court did not err by denying the Defendant's motion to exclude evidence on this basis. The Defendant is not entitled to relief on this basis.

## B.    Medical Examiner's Testimony

Before the trial, the Defendant sought to exclude any references to a wooden board that was recovered from the crime scene and provided to the medical examiner's office. The Defendant anticipated that a State's witness would testify at the trial that Mr. Gorny was struck on the head with a similar board. The Defendant argued that no forensic evidence connected the recovered board to the offenses and that, as a result, the board was "irrelevant under Rule 403, and the danger of unfair prejudice substantially outweigh[ed] its probative value." On appeal, the Defendant argues that evidence of the recovered wooden board was inadmissible pursuant to Tennessee Rule of Evidence 403 because the jury was "permitted to make the logical leap that this might have been the same weapon used in [the] murder."

Trial counsel argued that the wooden board recovered from the scene should have been excluded because no evidence showed the board was used to assault Mr. Gorny. Counsel argued that the board was irrelevant and prejudicial. The prosecutor argued that the crime scene was littered with wooden pallets, that the crime scene technicians recovered "some of those" boards for the medical examiner, and that the medical examiner compared the boards to Mr. Gorny's head injuries to determine if a board was consistent with the injury

pattern. The prosecutor stated that she did not intend to argue that the board was used to assault Mr. Gorny but that the medical examiner was expected to testify that the board was consistent with the object used to cause Mr. Gorny's head injury.

The trial court clarified that no forensic evidence was recovered from the board and that the parties did not dispute Mr. Gorny was murdered. The prosecutor stated that she would not argue that the board was the murder weapon, and trial counsel argued that the jury would infer that the board was the murder weapon, although no forensic evidence connected the board to the killing. The court permitted the State to present the board as evidence if the medical examiner could state that the head wounds were consistent with having been caused by an object, such as the board.

Dr. Cogswell testified that Mr. Gorny sustained three semi-circular lacerations to the right side of his scalp. Dr. Cogswell identified a photograph showing a piece of pallet wood with two nails protruding from it and stated that the police provided the board to him in order to determine whether the board caused the injuries to the right side of the scalp. Dr. Cogswell stated that although the board was consistent with having caused the injury, it was not a perfect match. The photograph of the board and Dr. Cogswell's testimony that the board was consistent with having caused the injuries, but not a perfect match, was relevant and probative of establishing how Mr. Gorny's injuries were inflicted. *See* Tenn. R. Evid. 401, 402. Furthermore, the evidence corroborated Ms. Warvi's testimony that Mr. Gorny was struck with a wooden board, fell on the ground, and "barely . . . defended himself." Dr. Cogswell testified that Mr. Gorny had no defensive wounds.

The evidence does not support a conclusion that the wooden board was used during the assault against Mr. Gorny. The jury could not have concluded, based upon this evidence, that the board was the murder weapon or that this particular board caused the head wounds. Rather, the evidence presented to the jury supported a conclusion that a similar board could have caused the injuries. Likewise, the probative value of the evidence was not substantially outweighed by any unfair prejudice. *See* Tenn. R. Evid. 403. Therefore, we conclude that the trial court did not abuse its discretion by admitting the evidence.

## C.    Autopsy Photographs

During the trial, the Defendant objected to the admission of six autopsy photographs relative to Mr. Colbert and to Mr. Gorny. The Defendant argued that the State intended to admit numerous photographs, that many other photographs could have been used to describe the medical examiner's determinations, and that the six photographs were cumulative and irrelevant to the medical examiner's testimony. The Defendant also asserted that any probative value of the photographs was "far outweighed" by the danger of unfair prejudice.

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The record reflects that the Defendant challenged the admissibility of three photographs taken during Mr. Colbert's autopsy. The photographs depict close-up images of a forehead abrasion, facial and nasal contusions with lividity, and an ear abrasion. The defense argued that the close-up photographs were cumulative, that other photographs showed the relevant injuries, and that the medical examiner's testimony would explain the injuries with specificity. When generally discussing the relevant photographs, the trial court asked trial counsel if he objected to the photographs on any basis other than their being cumulative. Counsel responded, "It's just that it's cumulative. That's what I'm going with." The prosecutor stated that she would not "belabor the point" with the photographs and that the medical examiner would discuss the injuries he observed in the photographs. The trial court determined that although other photographs showed Mr. Colbert's face generally, the two close-up facial images showed additional detail of the injuries. The court, likewise, determined that although other photographs showed the ears, the relevant photograph showed additional detail of the trauma sustained to the left ear. The court found that although the photographs were taken at the time of the autopsy, the photographs were not particularly gruesome or inflammatory. The court denied the defense's request to exclude the photographs.

The Defendant also challenged the admissibility of three photographs taken during Mr. Gorny's autopsy, all of which depict close-up images of the semi-circular head lacerations, on the basis that they were cumulative. The trial court determined that the photographs showed additional detail of the injuries and were relevant evidence. The court denied the defense's request to exclude the photographs.

We conclude that the trial court did not err by admitting the photographs. Although the photographs were taken at the time of the victims' autopsies, the injuries depicted in each

photograph appeared to have been cleaned, were not gruesome or horrifying, and showed clear images of the injuries. Although additional photographs generally showed these injuries, the close-up images of the victims' injuries were relevant to assisting the medical examiner explain to the jury the injuries with specificity. Dr. Cogswell utilized the photographs from Mr. Colbert's autopsy to discuss the length of the contusion on the forehead, to identify a nasal injury, and to show the ear injury was consistent with having been caused by a fingernail. Dr. Cogswell utilized the photographs from Mr. Gorny's autopsy to show the unique pattern of the semi-circular lacerations, the length of the wounds, and location of the wounds on the face. The photographs were not unnecessarily cumulative, and the probative value was not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions and remand for the entry of a corrected second degree murder judgment relative to Mr. Colbert to reflect the offense as a Class A felony.

_____
ROBERT H. MONTGOMERY, JR., JUDGE